

U.S. Department of Justice

*United States Attorney*
*Eastern District of New York*

GMP:FJN
F. #2019R000560

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

April 29, 2020

By Email and ECF

The Honorable Brian M. Cogan
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

      Re:    United States v. Martha Patricia Renteria Beltran
                 Criminal Docket No. 19-381 (BMC)

Dear Judge Cogan:

      The government respectfully submits this letter in response to defendant Martha Patricia Renteria Beltran's motion for release, in which she requests to be permitted to return to Mexico on an unsecured bond with no suretors or other safeguards due to the COVID-19 pandemic. The government objects to the defendant's proposed bail modification because the defendant has no ties to the United States, presents a significant flight risk, and the defendant's proposed bail package does not reasonably assure her appearance for future court appearances in the Eastern District of New York.

I.     Background

      The defendant is charged by indictment with conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956. The defendant is a citizen and resident of Mexico without ties to the United States.[1]

      From 2015 until her arrest, the defendant was a manager of the Tijuana, Mexico branch of CIBANCO, S.A., a Mexican commercial bank. The defendant was also a prolific money launderer for narcotics traffickers. The defendant and her co-conspirators coordinated cash pick-ups in the United States from narcotics traffickers. That money was

---

[1] The defendant is also the subject of a detainer lodged by United States Immigration and Customs Enforcement.

deposited into United States banks' accounts with instructions to convert the money to Mexican pesos and send it to CIBANCO-held accounts in Mexico. The defendant and her co-conspirators accomplished this by using front companies and other entities. Once the proceeds were in CIBANCO's possession, the defendant used her position at the bank to direct the money to pre-determined accounts that were accessible to her co-conspirators. The defendant's co-conspirators would then withdraw Mexican pesos from the CIBANCO accounts in order to purchase dollars from local exchange businesses. These converted dollars were then distributed to the narcotics traffickers with the defendant and her co-conspirators keeping a commission and the arbitrage between the CIBANCO exchange rate and the local exchange rate. For example, in April 2017, the defendant and her co-conspirators laundered approximately $183,000 in narcotics proceeds from the United States to Mexico through CIBANCO and a front company owned by the defendant's business partner. The money transfer utilized over 18 separate financial transactions, including transactions that had no business purpose, except to obfuscate the flow of the money.

The defendant was arrested in Seattle, Washington on September 7, 2019 during a layover on a flight from Canada to Mexico. The defendant had an identity hearing in the Western District of Washington on September 13, 2019. At that hearing, the Honorable Brian A. Tsuchida, United States Magistrate Judge for the Eastern District of Washington held that the government had met its burden of proving the defendant's identity and ordered the defendant removed to the Eastern District of New York in custody because there was no condition or combination of conditions that could assure her return to court or the safety of the community. On October 31, 2019, the defendant was arraigned before the Honorable Ramon E. Reyes, Jr., United States Magistrate Judge for the Eastern District of New York and she did not make a bail application. Since the defendant's arraignment, she has been detained at the Metropolitan Detention Center in Brooklyn, New York ("MDC").

II. Argument

The defendant now moves for release on bond due to the potential that she may contract COVID-19 while incarcerated at the MDC. The defendant asserts that she suffers from hypertension, and claims that this condition exposes her to potential complications should she contract COVID-19. Accordingly, the defendant moves for bail based principally on the existence of the COVID-19 pandemic. The Court should deny the motion because her proposed bail package does not reasonably assure her appearance at further proceedings. See 18 U.S.C. § 3142(e)(3).

The defendant's proposed relocation to Mexico raises serious concerns about her ability to flee and to resume operations as a money launderer. The defendant's proposed relocation places her in a foreign country beyond the reach of United States law enforcement and the orders of this Court. In addition, the defendant's proposed relocation also places the defendant in the very area where she previously carried out her money laundering activities. The risk of flight is further increased in this case because the government's evidence against the defendant is overwhelming and the defendant knows it. The government has produced discovery to the defendant in the form of ledgers, bank documents, text messages, the

2

defendant's own statements, photographs, and other evidence that unquestionably establishes guilt.[2] Moreover, the defendant is aware that the government calculates her advisory Guidelines range to be 78-97 months' imprisonment.

The proposed bail package does not seriously address these issues. The defendant offers no property, no sureties with moral suasion, no third-party custodians, or other conditions that would assure her return. The defendant essentially asks this Court to ignore the Bail Reform Act's requirement that the Court set conditions that "will reasonably assure" the appearance of the defendant and take a blind leap of faith. The Court should decline the defendant's ill-advised invitation.

Additionally, the defendant's request should be denied because the conditions of pretrial confinement—here, the possibility that COVID-19 may affect the defendant—are not a basis for release from custody under § 3142(g). See 18 U.S.C. § 3142(g) (requiring judicial officer to consider, in assessing detention, the nature and circumstances of the charged offense; the weight of the evidence against the defendant; the history and characteristics of the person; and the "nature and seriousness of the danger to any person or the community that would be posed by the person's release"). The factors set forth in § 3142(g) compel the defendant's detention in this case because she was—and in spite of the COVID-19 outbreak—remains a flight risk. The defendant's motion barely attempts to address these issues. Rather, the defendant focuses on her alleged vulnerability for COVID-19 complications should be become infected.

III. Release Is Not Warranted Under the "Compelling Reason" Clause

Notwithstanding the foregoing, the defendant seeks pretrial release because she is purportedly within an at-risk category for complications should she contract COVID-19. The defendant argues that temporary release is warranted under 18 U.S.C. § 3142(i), which provides that a "judicial officer may, by subsequent order, permit the temporary release of [a] person, in the custody of a United States marshal or another appropriate person, to the extent that the judicial officer determines such release to be necessary for preparation of the person's defense or for another compelling reason." (Def. Mot. at 2). Certain extreme medical circumstances may present "compelling reasons" that could warrant a highly circumscribed release. As Judge Nicholas G. Garaufis recently noted in rejecting an application similar to the instant motion, "[t]his provision has been used sparingly to permit a defendant's release where, for example, he is suffering from a terminal illness or serious

---

[2] Indeed, prior to the COVID-19 outbreak, the parties had been discussing dates for the defendant to plead guilty to the Indictment, with the understanding that some guidelines issues would be addressed at sentencing. The government has no objection to proceeding with a plea hearing via telephone or video conference given the current circumstances.

3

injuries." United States v. Hamilton, No. 19-CR-54-01 (NGG), 2020 WL 1323036, at *2 (E.D.N.Y. Mar. 20, 2020) (citations omitted). The defendant has not met this standard.

Here, the defendant has not established a compelling reason for her release. The defendant is a 55-year-old female who allegedly suffers from hypertension. While the defendant was on the MDC's list of at-risk inmates, that list was comprised of all inmates who were over 55-years-old or who self-reported a chronic condition. Thus, inclusion on the list does not indicate that the MDC supports or takes any position on the prisoner's release or susceptibility to COVID-19.

With respect to the defendant's hypertension, as a threshold matter, hypertension is not identified on the CDC's list of high-risk categories with respect to COVID-19.[3] Hypertension is one of the top COIVD-19 comorbidities in New York, but those figures are driven by an older demographic than the defendant.

The International Society of Hypertsenion emphasized that:

> To date – there is no evidence that people with hypertension are over-represented amongst those seriously infected by COVID-19. Indeed, the opposite is true given that most such cases occur in those 60 years in whom hypertension usually affects the majority.[4]

Likewise, the American Journal of Hypertension explained that:

> The most common comorbidities in one report were hypertension (30%), diabetes (19%), and coronary heart disease (8%). Another report showed that the most frequent comorbidities in patients with COVID-19 who developed the acute respiratory distress syndrome were hypertension (27%), diabetes (19%), and cardiovascular disease (6%). The frequency with which COVID-19 patients are hypertensive is not entirely surprising nor does it necessarily imply a causal relationship between hypertension and COVID-19 or its severity, since hypertension is exceedingly frequent in the elderly, and older people appear to be at particular

---

[3] CDC, Coronavirus Disease 2019 (COVID-19) Groups at Higher Risk for Severe Illness at https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/groups-at-higher-risk.html (last visited 4/29/2020).

[4] Statement from the International Society of Hypertension on COVID-19 at https://ish-world.com/news/a/A-statement-from-the-International-Society-of-Hypertension-on-COVID-19/ (last visited 4/29/2020).

4

>risk of being infected with SARS-CoV-2 virus and of experiencing severe forms and complications of COVID-19. . . .
>
>In conclusion, there is as yet no evidence that hypertension is related to outcomes of COVID-19, or that ACE inhibitor or ARB use is harmful, or for that matter beneficial, during the COVID-19 pandemic. Use of these agents should be maintained for the control of blood pressure, and they should not be discontinued, at least on the basis of current evidence at this time.[5]

Similarly, the American Heart Association only states that elderly patients with hypertension are at a higher risk if they contract COVID-19: "it appears <u>elderly</u> people with coronary heart disease or hypertension are more likely to be infected and to develop more severe symptoms."[8] Another article specified that "people over <u>65</u> with coronary heart disease or hypertension are more likely to be infected and to develop more severe symptoms[6] For the foregoing reasons, the defendant's hypertension does not constitute a compelling reason necessitating her release.

Furthermore, the BOP has implemented national measures to mitigate the spread of COVID-19 within prisons. <u>See</u> Federal Bureau of Prisons COVID-19 Action Plan, <u>available at</u> https://www.bop.gov/resources/news/20200313_covid-19.jsp. These measures, which have been implemented at the MDC, include the following:

- <u>Suspension of all social and legal visits</u>: Social visits and legal visits have been suspended, although confidential attorney calls are being provided. Inmates are provided additional inmate telephone minutes each month.

- <u>Inmate movement</u>: All inmate facility transfers have been suspended, with exceptions permitted for forensic studies or medical or mental health treatment.

- <u>Screening and testing of inmates</u>: All newly-arriving BOP inmates are screened for COVID-19 exposure risk factors and symptoms. Any inmate currently in BOP custody exhibiting symptoms consistent with COVID-19 is assessed by the institution's health services staff and placed in medical isolation. The remainder of the inmates in his or her unit will be quarantined to ensure that additional inmates do not develop symptoms. The inmate in medical isolation will be evaluated by medical staff at least twice per day, and the inmates on a medically-quarantined unit

---

[5] Hypertension and COVID-19 at American Journal of Hypertension at https://academic.oup.com/ajh/article/33/5/373/5816609 (last visited 4/29/2020).

[6] What Hear Patients Should Know about Coronavirues, at https://www.heart.org/en/news/2020/02/27/what-heart-patients-should-know-about-coronavirus (last visited 4/29/2020).

5

will have their temperature checked twice per day. In addition, inmates are tested for COVID-19 on a case-by-case basis in accordance with local health authority protocols.

- Modified Operations: The BOP is implementing modified operations nationally to maximize social distancing and limit group gatherings in BOP facilities, among other modifications specific to each facility.

Moreover, based on a March 18, 2020 letter from the Metropolitan Correctional Center ("MCC") and MDC to Colleen McMahon, Chief Judge for the United States District Court for the Southern District of New York, and an April 28, 2020 letter from the MCC and MDC to Rosslyn R. Mauskopf, Chief Judge for the United States District Court for the Eastern District of New York, the government is aware of the following additional measures that the MDC has taken in light of COVID-19:

- The facilities issue cleaning supplies to inmates once a week. They are available on each housing unit, and staff have been instructed regarding whom to contact should additional supplies be necessary.

- Staff are screening each staff member who enters the facility, including temperature scans.

- Inmate orderlies are cleaning the common areas of the institution, and every inmate has been reminded and instructed to continue to wipe down and sanitize their cells.

- Inmates have also been provided instruction via town halls regarding hygiene, and the same guidance is available on TRULINCS.

- Unit team staff are available on a daily basis for inmates to raise issues concerning food, shoes, and medical care.

Effective on April 1, 2020, the BOP implemented additional procedures to ensure the safety and wellbeing of inmates, including:

- From April 1, 2020 to May 18, 2020, inmates in every BOP institution will be secured in their assigned cells/quarters to decrease the spread of the virus. Inmates are released from their cells three days per week in order to shower, use the telephones, and the TRULINCS system. Inmates are also taken out of their cells for legal calls.

- To the extent practicable, inmates have access to programs and services that are offered under normal operating procedures, such as mental health treatment and education.

- The BOP, in conjunction with the United States Marshal's Services, is working to

6

significantly decrease incoming movement to all BOP facilities.

In short, the BOP is monitoring the status of the COVID-19 virus and is taking emergency steps to ensure the safety of its staff, inmates and the public. Indeed, this is reflected in the growing body of decisions in this district and the Southern District of New York rejecting applications for bail and continuing the detention of defendants. See, e.g., United States v. Marte, No. 19-CR-795 (SHS), 2020 U.S. Dist. LEXIS 56194, at *3-4 (S.D.N.Y. Mar. 30, 2020) (denying bond for a "long time smoker" defendant who was an "alleged leader of [an] oxycodone conspiracy," noting that "the community in its entirety" is facing the pandemic); United States v. Scorcia, No. 19-CR-442 (ILG), ECF No. 254 (E.D.N.Y. Mar. 27, 2020) (ruling that court had already determined defendant was a danger to the community and declining to release defendant based on COVID-19 pandemic for 54-year-old who cited poor health and claimed restrictions at MDC interfered with ability to prepare a defense); United States v. Lipsky, No. 19-CR-203 (NGG), Mar. 24, 2020 Order (E.D.N.Y.) (declining to release defendant, previously detained as a danger to the community, based on general risks of COVID-19 pandemic); United States v. Amato, No. 19-CR-442 (ILG), ECF No. 237 (E.D.N.Y. Mar. 20, 2020) (ruling that court had already determined defendant was a danger to the community and declining to release 61-year old defendant with asthma based on COVID-19 pandemic); United States v. Hamilton, No. 19-CR-54 (NGG) 2020 WL 1323036, at *1-2 (E.D.N.Y. Mar. 20, 2020) (declining to release defendant charged with two counts of murder while engaged in narcotics trafficking who had sought release due to the COVID-19 pandemic based on defendant's "advanced age and medical conditions," finding that defendant had not "met his burden to rebut the presumption of danger to the community that attaches based on" the charged acts of violence); United States v. Bradley, 19-CR-632 (GBD), ECF No. 25 (S.D.N.Y. Mar. 25, 2020) (denying bail application for inmate detained in MCC on controlled substances and firearm charges who had recently experienced a stroke and had high blood pressure); United States v. Rivera, 20-CR-6 (JSR), Mar. 25, 2020 Order (S.D.N.Y.) (denying bail application for inmate detained in MCC on controlled substance charge who had a childhood history of asthma); United States v. White, 19-CR-536 (KC), Mar. 25, 2020 Order (S.D.N.Y.) (denying bail application for inmate detained at Valhalla on controlled substance and Hobbs Act charges with history of whooping cough); United States v. Acosta, 19-CR-848 (NRB), ECF No. 14 (S.D.N.Y. Mar. 25, 2020) (denying bail application for inmate detained in MCC that "reli[ed] mainly on a form letter proffering general reasons to release inmates because of the spread of the COVID-19 virus"); United States v. Hildalgo, 18-CR-644 (LDH) (Apr. 10, 2020 Order (E.D.N.Y.)) (declining to release allegedly asthmatic defendant awaiting sentencing for being a felon in possession of a firearm even though the defendant's cellmate tested positive for COVID-19).[7]

---

[7] The cases cited by the defendant do not overcome the flight risk she would pose if released. See Def. Mot. at 3-4. The cases the defendant cites for a contrary conclusion are non-instructive as they involve more serious health conditions and/or

The defendant suggests that the MDC measures have been ineffective because the number of infected inmates has increased over time. That argument is unconvincing because it ignores the infection rate increase outside the prison and there are simply too many unknown variables when examining just the number of infected persons. For example, from April 1, 2020 to April 22, 2020, the number of reported cases in the United States increased from 213,144 to 802,583, an increase of 2.7 times or 276%.[8] That shows that despite all the measures implemented by federal, state and local governments the infection rate continued to increase. An even better and more relevant comparison to demonstrate the flaw in the defendant's argument would be to examine the infection rate after a state implemented a stay at home order. On March 22, New York State issued a stay at home order for its residents.[9] At that time, New York State had 16,887 confirmed cases.[10] By April 22, that number had increased 14 times or 1,460% with 263,460 confirmed cases in New York State.[11] The government does not cite these statistics to suggest that New York's measures have been ineffective, but rather to emphasize that focusing solely on the infection rate is misplaced. There are simply too many variables to assess the effectiveness of MDC's measures by focusing on the number of infected inmates.

Notably, the defendant's risk of infection is even lower than the majority of inmates. As of April 28, 2020, the MDC has reported 13 inmates and 30 staff members diagnosed with COVID-19. All of the COVID-19 positive inmates are male inmates. According to the MDC, the defendant has not been housed with any COVID-19 positive inmates because the female inmate population, which is substantially smaller than the male population, is housed in another building.[12] "[T]here is nothing to suggest that the Bureau of Prisons will be unable to mitigate or mange the effects of COVID-19, or will be unable to handle the medical needs of any inmate at MDC," including the defendant. See United

---

defendants with ties to the United States. Notably, none of the defendants were granted bail to a foreign country.

[8] https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us.html (last visited 4/29/2020).

[9] New York State 10 Point Plan at https://coronavirus.health.ny.gov/new-york-state-pause (last visited 4/29/2020)

[10] New York Times, New York Has Roughly 5% of Coronavirus Cases Worldwide, available at https://www.nytimes.com/2020/03/22/nyregion/coronavirus-new-york-update.html (March 22, 2020).

[11] https://covid19tracker.health.ny.gov/views/NYS-COVID19-Tracker/NYSDOHCOVID-19Tracker-Map?%3Aembed=yes&%3Atoolbar=no

[12] The defendant also states that she does laundry duties at the MDC and this places her at a higher risk of COVID-19 infection. The government has no objection to the defendant ceasing her voluntary laundry duties.

8

States v. Amador-Rios, No. 18-CR-398 (RRM) (E.D.N.Y. Apr. 12, 2020).  Because the defendant is not uniquely situated with respect to the risk of infection of COVID-19, her general circumstances do not establish "compelling circumstances" sufficient to overcome the significant flight risk she would pose if released.

IV.   Conclusion

The defendant has failed to present a bail package sufficient to overcome her flight risk.  The defendant has also failed to present a "compelling reason" for her temporary release under Section 3142(i).  Based on this information, and because the defendant poses a serious risk of flight, the permanent order of detention should remain in effect.

Respectfully submitted,

RICHARD P. DONOGHUE
United States Attorney

By:   /s/Francisco J. Navarro
      Francisco J. Navarro
      Assistant United States Attorney
      (718) 254-6007

cc:   Mildred M. Whalen, Esq. (by ECF)
      Clerk of the Court (BMC) (by ECF)